**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | **Criminal No. 17-10179-PBS** |
| | ) | |
| LYNDON SCOTT | ) | |

**GOVERNMENT SENTENCING MEMORANDUM**

The government is asking that this Court incarcerate Lyndon Scott for 21 months. That is the high end of what the government believes is the correctly calculated advisory guideline sentencing range. PSR at ¶77 (GSR is 15-21months).   Regardless of how the guidelines are calculated, however, 21 months is a sentence fully justified by the serious nature of: (1) Scott's drug trafficking inside the Orchard Gardens Housing Development ("Orchard Gardens" or "Orchard Park");[1] (2) Scott's criminal history, that includes two prior gun convictions and a 2014 probation violation;(3) the fact that he was arrested on another drug offense two weeks after his most recent probation was terminated; (4) that he was on pretrial release on that case when he made the charged sale here; and, (5) the critical importance of protecting the quality of life of the residents of this development and other nearby areas that also bear the brunt of street level drug trafficking and the violence that so often accompanies it. See Kennedy, "Pulling Levers: Chronic Offenders, High-Crime Settings, and a Theory of Prevention," 31 Val. U. L. Rev. 449, 455 (1997) ("Street drug markets are notorious sources of violence, disorder, prostitution and other problems. Mark Klieman notes that hard core cocaine and heroin users, while numbering no more

---

1 The Development was re-named Orchard Gardens when it was redeveloped in about 1999 by the BHA and two private developers utilizing HUD financing. Many still refer to the development as "Orchard Park."   The two terms will be used interchangeably here.

1

than three million nationally, commit crimes at very high rates; that three-quarters of them are likely to be arrested in any given year; and that they are likely to be on bail, probation, or parole when not actually incarcerated").

The government is also asking that the Court impose the minimum six years of Supervised Release required by 21 U.S.C. §860 and that this period be accompanied by special conditions that will both assist the Defendant upon his release and protect the residents of these ravaged neighborhoods.   Those special conditions include a narrow Geographic Restriction that will keep Scott out of the area immediately contiguous to Orchard Gardens and an Associational Restriction that will keep him away from his historic criminal associates.   Given "the nature and circumstances surrounding his offense," and the "history and characteristics of the Defendant," a sentence of 21 months that incorporates the requested special conditions fully complies with the factors set forth in 18 U.S.C. § 3553(c), reflects the profound impact that street level drug trafficking has on inner-city communities, takes into consideration the seriousness of Defendant's criminal record on two prior gun convictions and his persistent presence inside the Development with other Targets to the investigation even though he lived in a community more than 25 miles away.   PSR at ¶ 61 (residence outside Boston since 2007).   See also Detention Affidavit of BPD Detective Gregory Brown ("Detention. Aff.") at ¶¶ 56-58 (Information on Scott includes that he has two gun convictions and was arrested on pending crack cocaine case only two weeks after his probation on the second conviction was terminated and has dozens of FIOs inside the Development when he was in the presence of other Targets to the underlying investigation)(attached as Exhibit 1).

## I.     THE INVESTIGATION

In late 2015, the Bureau of Alcohol, Tobacco & Firearms ("ATF") and the Boston

Police Department ("BPD") commenced an investigation into gun and drug trafficking

directed principally at dealers operating in the Orchard Gardens Housing Development and

surrounding areas of Roxbury's Dudley Square.   See also Detention Affidavit at ¶¶ 21-25

(describing investigation); PSR at ¶¶ 9-12 (same).

The Orchard Park investigation was launched for two principal reasons. The first is

the high concentration of serious crime in and around the Orchard Park/Orchard Gardens

Development. Although overall crime in Boston has fallen in recent years, a review of data

specific to Orchard Park and the surrounding area shows that the Orchard Gardens

Development continues to suffer from a disproportionate amount of shootings and street

robberies as well as firearm and drug related arrests.   Specifically, statistics compiled by

BPD's Boston Regional Intelligence Center ("the BRIC") relative to these crime categories

since the beginning of the investigations show that between January, 2015 and April, 2017,

BPD recorded the following crimes as having taken place either inside or within 500 feet of

the Development: one fatal and ten (10) non-fatal shootings; eighteen (18) firearm arrests;

eighty (80) drug arrests; and fifty-one (51) robberies. See Detention Aff., ¶ 14 (Exhibit 1).

In addition to the amount of crime, its concentration in and around the Orchard

Gardens/Orchard Park Housing Development is also a concern both to the Boston Police

Department and to many area residents.   Attached to the Detention Affidavit as Exhibit 2

are maps prepared by the BRIC that depict the geographical locations within District B-2

where the highest concentration of drug and firearm offenses, shootings and street

robberies have occurred for the same period.   In every category identified (shootings,

robberies, firearm arrests, and drug arrests) the area in and around the Development is associated with area B-2 hotspots.

Of course, crime committed in and around the Development is not limited to the major crime categories already discussed. In addition, residents of the Development are also confronted with quality of life offenses such as trespassing, public drinking and drug use, disorderly conduct and prolific use of (mostly illegal) dirt bikes or other public disturbances.   Most of these crimes are committed by individuals (many of whom are associated with the Orchard Park Trailblazers or other area gangs)[2] who persistently hang around the Development in large groups often taking over street corners, front stoops, play areas, parking lots or even entire streets, thereby forcing residents to go around them to get to their homes. Police vehicles are often challenged when they go into the Development by these crowds. Attached to the Detective Brown's Detention Affidavit as Exhibit 3 are still photos taken from some of the buys and stills from BPD body cameras that reflect these conditions.

Orchard Park residents frequently express concerns to the leadership of District B-2 and the beat officers who routinely patrol the Development for their safety and the quality of life within their community.   Complaints of groups of young males (often individuals who may have grown up in the area or have relatives in the area but who themselves now live outside the Development) congregating in front of residences, in courtyards, and within the playgrounds of the Development are commonplace.   Orchard Park gang

---

2  Much of the criminal activity described above is attributed to individuals associated with the Orchard Park Trailblazers.   The Orchard Park "Trailblazers" consists of approximately sixty-six (66) members and associates that have been verified by the Boston Regional Intelligence Center ("the BRIC").   No less than 12 of the 13 Targets to this investigation (including Scott) are identified as members of Orchard Park or VNF, another area gang.

members persistently utilize areas within the Development as open-air drug distribution markets and are often themselves seen consuming marijuana and alcohol in public.   This has led to an atmosphere of fear and intimidation among the communities' residents.[3] Both the buys that were made and surveillance conducted during the course of this investigation have corroborated these complaints.   See Detention Aff., Exhibit 3 (still frames from charged buys and BPD Body Cameras that reflect crowds of young men who frequent the Development to hang out, use drugs and drink, sell drugs and commit other "quality of life" offenses).   Although the Defendant here was not captured in any of these still photographs, BPD records reflect that Scott has 78 FIOs, more than 50 of which were in the area of the Development and 20 of which were conducted while Scott was in the company of other Targets to this investigation.

Incidents such as those reported herein continue to plague Orchard Gardens in spite of the concerted efforts of the Boston Police Department to proactively patrol in the Development.   Known Orchard Park members and associates are routinely encountered by officers assigned to District B-2 and the Youth Violence Strike Force.   However, as is

---

3  Among other things, it is believed that the constant presence of these individuals can leave residents afraid to place calls for police service, thereby leading to under-reporting of crime, such as large groups congregating/trespassing in courtyards and in front of residences for the purpose of, among other things, distributing and using narcotics.   See Detention Affidavit at ¶17 note 3.

In addition, when members of local street gangs, such as the Orchard Park Trailbazers, consistently congregate in large groups and in the same areas, they put themselves (and everyone else in the area) at an increased risk of being victimized by firearm violence committed by rival gangs.   This is due to the simple fact that since Orchard Park members have become easy to locate, and thereby have made themselves easier targets.   Unfortunately, circumstances such as these often leave the many law-abiding residents of the Development and their families at an increased risk of becoming the unintended victims of such violence. Id.

most often the case during these encounters, the officers are left with little to no

enforcement options if the encounter does not rise to the level of arrest; the encounter is

documented on a field interrogation, observation and/or frisk report ("FIO") and these

individuals are free to stay in the community.[4]

To address the crime and quality of life issues at Orchard Park, ATF partnered with

members of BPD's Special Investigations Unit ("SIU") in this investigation.   Its principal

goal was to attack drug and firearms trafficking in and around the Development with

specific emphasis being placed on street-level drug dealers and Orchard Park Trailblazers

who use the Development as their base and thereby adversely affect quality of life issues

for the Development's residents for all the reasons already described.

Cooperating witnesses ("CWs") were utilized during the investigation.   The CWs

(who were strangers to the area and to the Targets) were deployed by investigators in and

around the Development. Notwithstanding the CWs lack of familiarity with both the

Development and the Targets, they made 46 gun and drug buys between October 2015 and

May 2017.   All of the buys (and many conversations leading up to the buys) were

recorded) recorded on audio and/or videotape.

## LYNDON SCOTT'S INVOLVEMENT IN THE INVESTIGATION AND IN THE ORCHARD GARDENS AREA[5]

The government believes that Lyndon Scott is one of the individuals who has

contributed to the crime and has helped damage the quality of life for Orchard Gardens'

---

4  Even when the quality of life offenses described herein lead to arrests, the resulting criminal charges often carry little or no consequences in busy courts focused on offenses that are admittedly more serious

5  Facts from this section of the Memorandum come from the un-objected to provisions of the PSR and Detention Affidavit attached as Exhibit 1.

residents. Scott is identified as being associated with the Orchard Park Trailblazers by BPD's Boston Regional Intelligence Center and by his BPD Incident Reports and FIOs that show him to have been a regular presence in and around the Orchard Gardens Development.[6]  Specifically, Scott has either been FIO'd or captured in Incident Reports as being in the company with the following OP members who were also Targets in the underlying investigation: Diamond Brito, Daiquan Lucas, Jaylin Hawkins, Andre Parham-Rankin, Raul Williams, Raymond Gaines, Jeremiah Mines, and Tyree Draughn.[7]  See Summary of BPD Reports at pp 9-31 and FIOs (attached as Exhibit 2) at 7 (with Tyre Draughn); 8 (with Jaylin Hawkins and Raul Williams); 11 (with Daiquan Lucas, Jaylin Hawkins); 13 (with Daiquan Lucas, Jaylin Hawkins); 16 (Jeremiah Mines); 18 (with Jaylin Hawkins, Raymond Gaines); 19 (Jaylin Hawkins); 20 (Jeremiah Mines); 21 (Daiquan Lucas); 22 (with Jaylin Hawkins and Andre Parham-Rankin); 23 (with Jaylin Hawkins and Andre Parham-Rankin); 24 (with Jaylin Hawkins); 26 (with Tyree Draughn); 27 (with Jaylin Hawkins); 30 (with Andre Parham-Rankin); 34 (with Raymond Gaines); 35 (with Andre Parham-Rankin); 37 (with Tyree Draughn); 57 (with Jaylin Hawkins); 62 (with Tyree Draughn). Still more Incident Reports and FIOs reflect his presence in and around

---

6 The government notes that, in the recent case of United States v. Cortes-Medina, 819 F.3d 566 (1st Cir. 2016), the First Circuit expressed concern over a sentencing court's reliance on a "record of multiple arrests and charges without convictions unless there is adequate proof of the conduct upon which the arrest or charges were predicated." 819 F.3d at 570.   Here, the government is not relying on the mere fact of arrests that did not mature into convictions to enhance the defendant's jail sentence but rather only on the location of arrests and other interactions the Defendant has had with the police in the area of Orchard Gardens in support of the requested Special Conditions of Supervised Release described below.

7  In many of these FIOs, the defendant was also in the company of others from the area who were not Targets to the underlying investigation.   Many of these individuals also have felony convictions or are identified members of area gangs.

the Development even though he did not reside anywhere near it. [8] Id. at pp. 4 (7/4/10

incident where officers see car travelling the wrong way on Orchard Park Street; when

driver (not Defendant) sees police, he speeds up; Defendant, Dean Lambright and Rashonn

Scott in car); 5 (Defendant's 2011 gun arrest originates in Orchard Park before Defendant

flees and gun is recovered along path of flight); 6-1 (Police stop rental car in the

Development occupied by Defendant and Andre Parham-Rankin and recover marijuana)

6-2 (Police respond to call for shots fired inside Development and find Defendant and

Andre Parham-Rankin in car smoking marijuana).   See also pp.9-31 (78 FIOs that include

dozens in the area of the Development including many in which the Defendant was in the

company of other Targets).

The Defendant's real connection with the Orchard Gardens Investigation, however,

comes from the videotaped crack sale he made while in the area of the Development and

the two other occasions when he was contacted by the CW and immediately agreed to sell

her more crack. PSR at ¶ ¶ 13-23 (April 14, 2017 charged sale during which Scott told the

CW that his crack was "great," that she would be coming back to buy more and told her he

would sell a gram of crack for $80); 24 (June 6, 2017 call when Scott immediately agreed

to sell CW more crack); 25 (incident on June 7, 2017 when CW called Scott and offered to

purchase more crack so they could confirm his use of phone and officers watched Scott

come to agreed location adjacent to the Development and the Orchard Gardens K-8 Pilot

---

[8]  As set forth above, BPD records indicate that Scott had been FIO'd 78 times even
though he has spent substantial periods of the last 5 years in jail.   PSR at ¶45 (On May 17,
2012, Defendant sentenced to 3.5 years on Massachusetts gun conviction); 44(On July 6,
2010, Defendant sentenced to 5 years with 8 months to serve on Rhode Island gun
conviction; on August 5, 2014, Defendant sentenced to an additional year after violating his
state court probation).

School looking for CW).   The CW was able to make the buy and the other contacts with Scott even though she did not know him and had no contact prior to the charged deal. Scott also facilitated additional sales he was ready and eager to make to both by giving the CW his telephone number and responded to both calls she placed to him.   PSR at ¶¶13-27.

The government believes that it is important for the Court to understand just how aggressive the Defendant was in pushing his drugs onto the CW in an effort for her to come back for more.   Accordingly, the excerpted video from the charged buy and a transcript for that video are attached as Exhibits 3 and 4.

The other way in which the Defendant targeted himself in this investigation was his participation in activities at or near Orchard Park that, while less serious than drug trafficking, still adversely affected the quality of life for the families that call the Orchard Gardens Development their home.   The government has already shown the ongoing connection between the Defendant's interaction with the police and the Orchard Gardens Development.   See discussion, above.   The persistent nature of these activities shows the indifference that Scott and his fellow Targets and associates have to the rights of the lawful residents of the Orchard Gardens Development who merely wish to provide a safe and positive environment for their families.

## THE DAMAGE DONE BY DRUG TRAFFICKING

Drug trafficking like that undertaken by Lyndon Scott thus has many victims. While it obviously affects the direct users of the drugs, the resulting misery goes much deeper. Spouses, significant others, children, relatives, friends, employers and communities as a whole all feel the sting of crack cocaine, heroin, and the other illegal drugs in their midst day after day, both in the effects the drug has on individual users and the impact that drug

dealing (and the violence it has been shown to breed) has on the quality of life in ways outsiders may find difficult to appreciate.

As prosecutors, it is difficult to find spokespersons for the damage that crack and heroin dealing does.   It is usually impossible to locate specific victims, much less induce them to speak. So we are forced to rely on our own common sense and to look to what community leaders and academics tell us about living in neighborhoods that are almost in the shadow of this Courthouse but that must seem like they exist in a different world.

One voice that has been heard about the effect of all this on our communities is the Rev. Eugene Rivers, former head of the Ten-Point Coalition and the current director of the Ella J. Baker House.   Shortly after the infamous quadruple murder in Mattapan in 2010 (which was ultimately tied back to drug trafficking), Rev. Rivers was interviewed on WBUR about the mood of the communities in which the murders occurred.   The government offers his comments, not to criticize anyone involved in the criminal justice system, but because they poignantly express the outrage many in that neighborhood felt:

> The Clergy have to be clear that, if you do the crime, you have to do the time.   We no longer rationalize or make excuses for over-the-top, out of control, unacceptable behavior.   The Black Church must take the hard line that, if you do the crime, kid, you should go to jail.   The Black Churches have to challenge the judges to stop coddling criminals and then putting them back on the streets to wreak havoc in the Black Community. That is absolutely correct.[9]

Reverend Rivers is not the first inner-city resident to recognize the havoc that a small minority involved with drugs and drug-related violence can have on entire communities visible only in times of tragedy but who live with the reality of street dealers like Scott every day.   See also Donald Braman, "Criminal Law and the Pursuit of Equality," 84 Tex.

---

9  A copy of the CD containing these remarks will be available at sentencing.

L. Rev. 2097, 2098 (2006) ("Despite the Constitution's guarantee to equal protection, it is fair to say that today most Black Americans feel neither equal under nor protected by our criminal laws. The effects of under enforcement are devastating:   Many people living in our nation's inner cities no longer feel safe walking through their own neighborhoods."); article also discussed the results of a 1996 study that showed that a majority of Black Americans "are afraid to walk alone at night near their own home"); Tracey L. Meares & Dan M. Kahan, "When Rights Are Wrong," in Urgent Times: Policing and Rights in Inner-City Communities 3, 4 and 15 (Joshua Cohen & Joel Rogers eds., 1999) (describing how the building search policy of the Chicago Housing Authority was declared unconstitutional over the objections of the community residents whose constitutional rights were supposedly being protected and noting that "instead of shunning the police, inner-city residents are demanding that police give them the protection they have historically been denied.").[10]

---

10  More recently, a judicial voice joined the conversation about the seriousness of drug offenses and what they do to communities:

> The drug crimes prosecuted in the federal courts are always violent, and I mean that literally. When you distribute a substance that you know is poison to another person that is a violent act. Period. End of story. Moreover, the connection between guns and drugs is beyond dispute. Not every purveyor of drugs uses or carries a gun, but the world where they operate organizes around one thing and one thing only, guns.   Still further, whole neighborhoods that were once rich, vibrant and nurturing are now literal war zones because of drugs.   In large swaths of America, functional families are no more because of drugs. Like global warming, these are inconvenient truths.

> To be sure, addiction and poverty drive many offenders and those factors often substantially lessen (or should substantially lessen) a federal offender's culpability.   And, I certainly agree that statutory mandatory minimum sentences make little sense and have resulted in federal prison sentences that are far, far longer than are wise or just.   In that same vein, I strongly support those who want to lessen the number of people we put in federal prisons.

> But, I am also a legal realist.   To say that federal drug crimes are "non-violent" is bullshit–plain and simple.

See generally United States Sentencing Commission, "Cocaine and Federal Sentencing Policy," (May, 2007) at 86 ("According to [Professor Alfred] Blumstein, the [40% reduction in national violence since 1993] is attributable to a reduction in new users of crack cocaine and a consequent reduction in the crack cocaine street markets."); Johnson, "Patterns of Drug Distribution: Implications and Issues," 38 Substance Use and Misuse 1795 (2003) cited by the Sentencing Commission for the proposition that "almost all crack cocaine related violence of the 'systemic' type, that is violence that occurs within the drug distribution process.").

## II.   AGGRAVATORS FOR LYNDON SCOTT

Undoubtedly, the Defendant in this case will point to the small amount of crack cocaine purchased from him as a factor that warrants a sentence lower than that sought by the government. PSR at ¶¶ 18-19. Any such argument is misguided in the particular facts of this case because Scott's crimes are exactly the kind of street level trafficking that tends to breed violence in various and all too familiar ways.    See discussion at page 1, above (article by Prof. David Kennedy correlating street drug markets with a wide range of criminality).    They are also aggravated by several factors discussed below.

A.    **The repetitive nature of Scott's drug trafficking.**    The first thing that aggravates the seriousness of the offense of conviction is Scott's documented willingness to sell crack cocaine in and around the Development on at least three occasions. While Scott only made one sale in this case, he made it clear that he was prepared to sell more

---

The Honorable Richard G. Kopf, District Judge District of Nebraska (September 8, 2013) available at "Hercules and the Umpire. The Role of the Federal Trial Judge" available at http://herculesandtheumpire.com/2013/09/08/no-more-bullshit-in-the-federal-courts-there-is-no-such-thing-as-a-non-violent-drug-crime/.

based on what he said during the charged buy and what he did when the CW contacted him on June 6 and again on June 7.   See Exhibits 3 and 4 (buy video and transcript).   See also PSR at ¶¶13-27 (June 6 buy and later calls to Defendant in which he agreed to sell the CW more crack).   While we will never know the full extent of Scott's crack dealing, his readiness to sell crack cocaine to strangers (when he was already on pretrial release for another drug case in which he was arrested with an estimated 10 grams of crack cocaine less than a mile from the Development) while simply standing around the Orchard Gardens Development show his crimes to be more serious than someone who made but a single sale even though the overall drug amounts remain small. See also United States v. Schmude, 901 F.2d 555, 559 (7th Cir. 1990) ("[r]ationally, if a defendant has been convicted for the same offense more than once, he has demonstrated the need for greater sanctions to deter him from committing that same crime again-greater sanctions than might be required for a defendant who has never been convicted of a similar offense.").[11]

### B.   Scott chose to sell his drugs inside a Public Housing Development.

Another aggravator in this case is that Scott chose to sell his crack cocaine inside a public Housing Development, "preying on those most vulnerable to the ills of drug addiction." United States v. Jenkins, 2009 WL 1444438, *4 (E.D. Pa. 2009).   Accord, United States v.

---

11  Although this evidence is not readily convertible into amounts of crack cocaine that can be attributed to the Defendant under USSG §2D1.1, it confirms that Scott's trafficking went beyond the drugs on the charged sales. The government therefore asserts that the requested sentence of 21 months to be a reasonable and appropriate one in order to punish Scott, protect his community, and to deter both him and others from engaging in similar conduct both inside Orchard Gardens or elsewhere in Dudley Square. See United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (recognizing that economically based crimes–as drug trafficking is here–are "prime candidates for general deterrence"); 18 U.S.C. § 3553(a)(2)(B) (the district court may impose a sentence "to afford adequate deterrence to criminal conduct").

Gibbons, 553 F.3d 40 (1st Cir. 2009) (affirming sentencing judge's refusal to vary where Defendant was dealing drugs in inner city housing project).   See also United States v. Blaso, 2008 WL 227863, *3 (3rd Cir. 2008) (affirming sentence that recognized the "catastrophic consequences of crack dealing"); United States v. Taylor, 2007 WL 1224045, *5 (7th Cir. 2007) (affirming crack sentence based on, among other things, judge's recognition that "that crack dealing is a serious crime because crack is highly destructive to its consumers").   In view of all this, a sentence of 21 months is appropriate.

### C.   Scott is not a User of Crack Cocaine

Another aggravator in this case is that the Defendant is not a user of drugs.   PSR at ¶66 (Defendant reported he drank alcohol once and smoked marijuana twice and denied the use of any other substances).   The fact that the Defendant was selling crack for profit rather than to feed an addiction, makes his activity more serious.

### D.   Criminal History Issues

Scott's criminal history also show that a sentence of 21 months is warranted.   As already noted, Scott entered the Criminal Justice System in 2010 at age 20 after Rhode Island police found a loaded handgun hidden in his buttocks after a car stop in which marijuana was also recovered from Scott and from the car in which Tory Thorton and Dayshawn Matthews were also riding.   PSR at ¶44.   Scott received a five-year sentence on that case with all but 8 months suspended.   Id.

Unfortunately, this first offense, the hefty sentence that went with it, and the leniency shown by the Rhode Island State Court in suspending all but 8 months, had little effect on Scott's offending.   While still on Probation in Rhode Island (and about 6 months after he had been released from prison there), Scott picked up *another gun conviction* after

officers from BPD's District B-2 responded to a call for a man with a gun at Orchard Park and the Defendant ran from them, disposing of another gun during the chase.   On May 17, 2012, the Defendant received a sentence of 3.5 years-3.5 years and a day even though he could have been eligible for a five-year mandatory minimum under Massachusetts law because it was his second gun conviction. See PSR at ¶45.   In turn, he was then violated on probation, but was required to serve only 1 year of the 4 years and 4 months hanging over his head (once again, wasting leniency). Id., at ¶ 44.   Two weeks after he finished his probationary period on his Massachusetts gun case, he was arrested on a crack case near the Roundhouse Hotel in Roxbury after police recovered what was identified as 10 grams of crack hidden in his waistband as well as a digital scale and over $1000 in cash. PSR at ¶49.   And if all this were not enough, he sold the CW more crack here while still on pretrial release on that case.   See United States v. Johnson, 631 F.Supp. 2d 946, 951 (E.D. Tenn. 2009) (affirming above-guideline sentence based on, among other things, the frequency and escalating nature of the defendant's crimes and the resulting need to protect the public); United States v. Schmude, 901 F.2d 555, 559 (7th Cir. 1990) ("[r]ationally, if a defendant has been convicted for the same offense more than once, he has demonstrated the need for greater sanctions to deter him from committing that same crime again-greater sanctions than might be required for a defendant who has never been convicted of a similar offense.").   See also United States v. Hernandez, 896 F.2d 642, 645 (1st Cir. 1990)("a defendant undermines the integrity of the criminal justice system when he commits a crime while ... under its supervision and control"); United States v. Wallace, 573 F.3d 82, 96 (1st Cir. 2009) (commission of crime at a time when "one would expect a careful abidance to the law ... demonstrated [defendant's] propensity for criminal behavior")(internal

quotations omitted). <u>Compare</u> <u>United States v. Hairston</u>, 502 F.3d 78 (6th Cir. 2007)

(affirming 51% reduction from guideline range where Defendant sold crack cocaine to

support his own drug dependence). <u>See also</u> <u>United States v. Blaso</u>, 2008 WL 227863, *3

(3rd Cir. 2008) (affirming sentence that recognized the "catastrophic consequences of crack

dealing"); <u>United States v. Taylor</u>, 2007 WL 1224045, *5 (7th Cir. 2007) (affirming crack

sentence based on, among other things, judge's recognition that "that crack dealing is a

serious crime because crack is highly destructive to its consumers"); <u>United States v.</u>

<u>Gama-Gonzalez</u>, 469 F.3d 1109, 1111 (7th Cir. 2006)("This theme--that lenience in the

past requires more lenience today--has things backward. When mercy does not succeed in

achieving specific deterrence, and the beneficiary continues a life of crime, we learn that

additional severity is essential.").

### **SUPERVISED RELEASE**[12]

The government also believes that the Defendant should be placed on supervised release

for the minimum period of 6 years and that his supervised release should include special

conditions designed to help ensure that the Defendant does not revert to his past ways in order to

protect the community and protect the Defendant from himself.

---

12 Any plan designed to give the Defendant the maximum chance at fundamental life change must of course begin with the terms and conditions of his incarceration. <u>E.g.</u>, <u>United States v. Gautier</u>, 590 F. Supp. 2d 214, 235 (D. Mass. 2008) (Gertner, J.) ("I have required Probation to devise a recommended plan for him, both as a recommendation for the Bureau of Prisons during the period of his incarceration and as a template for his supervised release afterwards.   Studies suggest the significance on recidivism of a consistent plan, beginning in prison and extending into reentry.   Laurie Robinson & Jeremy Travis, 12 Fed. S.R. 258 (2000)").   The government is requesting that the Court make recommendations to the Bureau of Prisons that the Defendant be given any available vocational training (so that he may have increased job skills when he is released).

### A. The Defendant should be required to reside at an RRC if a suitable residence is not available

Based on the PSR, it appears that that the Defendant will have a viable residence upon release.   If he does not, he should therefore be required to stay in a Residential Center for 6 months or until a suitable residence is found. The government recommends that the RRC be located outside of Boston.

### B. Curfew

The government also recommends that the Defendant be subject to a 9 p.m.-7a.m. curfew for the first 6 months of supervised release after he is released to the street.   See, e.g., "Maximum Impact: Targeting Supervision on Higher Risk People, Places and Times," Pew Center for the States Public Policy Brief (March, 2009) (concluding that Probationers are "at the highest risk of re-arrest during the first few months on community supervision," that arrest rates after 15 months were substantially lower, and thus recommending that probation resources be "front end loaded" to achieve maximum effect).   The Probation Office should have the power to relax the curfew (which should be enforced by electronic monitoring) for school or employment.

### C. Substance Abuse Treatment

The Defendant should be tested for drug use and be required to go to drug counseling if directed by Probation.

### D. Associational and Geographic Restrictions

The government believes that Associational and Geographic Restrictions will help to assist Scott upon his release from prison.   Copies of the restrictions are attached as Exhibit 5.

The rationale for such restrictions has been explained as follows:

Recidivism is due to offenders' retaining criminogenic motivation or propensity

and their having access to opportunities for crime.   Thus, to reduce re-offending, an important task for a probation or parole agency is to provide or place offenders into treatment programs, based on the principles of effective rehabilitation, that diminish their propensity for crime.   *The other task, however, is for probation and parole officers to reduce offenders' access to crime opportunities.*

Cullen et al, "Environmental Corrections—A New Paradigm for Effective Probation and Parole Supervision" 66 Federal Probation 28 (2002) (hereinafter referred to as "Cullen")(emphasis supplied).   Because both the literature and common sense show that opportunities for crime will be presented whenever a Defendant returns to the area in which his offending began and grew (and in which his street credentials and sense of self may have been based on that very criminality), removing him from that area can reduce both the opportunities for further crime and the expectation from those around him that he will re-offend.   Thus, "[t]he effectiveness of probation and parole supervision will be increased to the extent that officers systematically. . . reduce the extent to which offenders are tempted by and come into contact with opportunities for crime."   Id. at 31. See also La Vigne et al., "Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, Mar. 2006, at 25 ("most potential offenders are not highly motivated to commit crime but do so when they are presented with opportunities to offend easily."); Dickey et al, "Promoting Public Safety: A Problem-Oriented Approach To Prisoner Reentry in Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, May 2004, at 61-62 ("when offenders first reenter communities, they themselves are vulnerable, for all of the reasons that have been suggested in literature on reentry: mental health problems, lack of family connections, drug and alcohol addictions, lack of education and employment. . .Fixing these problems is often implausible. . . .Instead, we can alter environments

18

[and] remove temptations. . . ").

As commonsensical as these notions are, effective implementation is equally straightforward.   Rather than rely exclusively on the sweeping provisions set forth in U.S.S.G. §5D1.3 (c) (8-9) (which, among other things now require the Defendant to know that the individual with whom he is associating has a felony conviction), the literature suggests that narrower restrictions are more effective--restrictions precluding the Defendant from being with particular, identified people or specifically delineated areas that the record shows have previously led him into crime. Cullen at 33 (recommending that probation officers attempt "to disrupt routine activities that increase crime opportunities" that are based on the Defendant's past offending by, among other things, prohibiting contact with specific people (e.g., past co-offenders) and "prohibiting traveling on specific streets" (e.g., areas of past criminality outlined on a map given to the offender). That is exactly what the government seeks to do here.[5]

Of course, the government cannot advocate such restrictions without establishing their appropriateness.   Appellate courts have routinely upheld such restrictions as a condition of probation or supervised release whenever, as here, the restriction served as a deterrent to protect the victimized community and/or rehabilitate the Defendant based on his prior offending.   See United States v. Garrasteguy, 559 F.3d 34 (1st Cir. 2009) (affirming on plain error review 12-year restriction from Suffolk County imposed on Defendant who sold drugs at Bromley Heath

---

[5]   In a presentation made to the Boston Bar Association, the Probation Department publicly stated that "associates and attitudes" are the two most important indicators or recidivism. While a Defendant's attitude can be harder to change in the short-term, (but can be helped by training like the Moral Reconation Therapy Program offered by Probation and to which Mines should be referred), access to criminal associates can be restricted by exactly the type of associational and geographic restrictions sought here and frequently imposed in other similar cases.

Housing Development);   United States v. Watson, 582 F.3d 974 (9th Cir. 2009)(validating

restriction that prevented Defendant from entering the city and county of San Francisco without

the prior approval of his Probation Officer); United States v. Cothran, 855 F.2d 749 (11th Cir.

1988) (validating a probation restriction that prevented Defendant, convicted of cocaine

distribution to minors, from traveling to Fulton County, Georgia, because his return to a high-

crime neighborhood in southeast Atlanta would likely result in his continued criminal activity

and the endangerment of neighborhood youth); United States v. Sicher, 239 F.3d 289, 292 (3d

Cir. 2000) (upholding a supervised release restriction, after various drug convictions, that

covered two counties in the Allentown, Pennsylvania, area because the "territorial limitation

[was] clearly intended to promote [Defendant's] rehabilitation by keeping [Defendant] away

from the influences that would most likely cause her to engage in further criminal activity").[13]

See also United States v. Alexander, 509 F.3d 253, 256-57 (6th Cir. 2007) (affirming condition of

supervised release that required Defendant to live in city several hundred miles away from

---

[13]In approving the much broader geographic restriction imposed in Garrasteguy, the First
Circuit described the legal framework for such conditions as follows:

> District courts have significant flexibility to impose special conditions of
> supervised release.   A district court may impose as a condition of supervised release
> most discretionary conditions identified in 18 U.S.C. § 3563(b), or any other condition
> the court deems appropriate. All such conditions, however, must be "reasonably related"
> to the factors set forth in § 3553(a), may involve "no greater deprivation of liberty than
> reasonably necessary" to achieve the purposes of §§ 3553(a)(2)(c), (a)(2)(D), (viz. to
> protect the public and promote the rehabilitation of the Defendant), and must be
> consistent with any pertinent policy statement of the United States Sentencing
> Commission. 18 U.S.C. § 3583(d); see also United States v. York, 357 F.3d 14, 20 (1st
> Cir.2004).

559 F.3d at 41 (footnotes omitted).   A court should also explain the reason for imposing the
conditions and, in doing so, discuss how they relate to the statutory sentencing factors contained
in 18 U.S.C. §3553.   See United States v. Thompson, 777 F.3d 368, 373-74 (7th Cir. 2015).

family for first 12 months of supervised release; court noted that condition: (a) "will further

[Defendant's] rehabilitation efforts by temporarily removing him from the destructive influences

that have plagued him"; and (b) "holds the potential to protect the community from future crimes

as well"); 18 U.S.C. § 3563(b)(6) (authorizing conditions that a Defendant refrain from

associating unnecessarily with specified persons) & 13 (authorizing conditions that a Defendant

refrain from residing in a particular area).

The requested restrictions should also be imposed here because the need for them is fully

supported by the record. Even Scott has recognized that going back to Orchard Gardens makes

no sense.   PSR at ¶ 79 ("[T]he defendant does not believe that returning [to his prior residence

inside Orchard Gardens] would be beneficial to him").

The restrictions are based on Scott's prior criminal contacts as shown on historic

Boston Police Department Reports or FIOs attached as Exhibit 2.    All of the persons on the

Associational list are individuals who BPD records show Scott was associating with usually in

the very same area.   Almost all have either felony convictions or are listed on the BPD Gang

Database and are therefore persons with whom Scott should not be associating.   The Geographic

Restriction focuses on the area of the Development where much of Scott's offending and

criminal associations have been based.   Both will therefore help protect the Orchard Gardens

community and help the Defendant avoid new opportunities for crime that could lead to a much

higher sentence.

### F.    <u>Other Recommendations</u>.

Other recommended special conditions include continued education/vocational training,

that the Defendant be required to participate in Probation's MRT Program as directed by his

Probation Officer, and that the Defendant receive a judicial recommendation for RESTART.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

By: /s/John A. Wortmann, Jr.
    JOHN A. WORTMANN, JR.
   Assistant U.S. Attorney
    One Courthouse Way
    Boston, MA
    (617) 748-3207

## CERTIFICATE OF SERVICE

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

/s/ John A. Wortmann, Jr.   2/22/18
JOHN A. WORTMANN, JR

22