UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

vs.                                    Docket No. 17-10179-PBS

LYNDON SCOTT

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Lyndon Scott submits this memorandum in support of his request for a sentence of twelve months and a day followed by six years of supervised release, with proposed modifications to the conditions of supervised release as suggested by the Government.  Mr. Scott is an intelligent, charismatic, and capable person who regrets the mistakes he made in his youth, and in this case.  Now a father, and approaching the age of thirty, Mr. Scott has a different vision for his life.  The information herein establishes a sentence that "is sufficient but not greater than necessary" to achieve the sentencing purposes of § 3553(a).

**<u>STATEMENT OF THE CASE</u>**

On June 15, 2017, the defendant was arrested and charged in this court with a single count of distribution of cocaine base within 1000 feet of a school, in violation of 21 U.S.C. § 841(a)(1), and 21 U.S.C. § 860. PSR ¶ 2.  From October of 2015 to May of 2017, the Bureau of Alcohol, Tobacco & Firearms (ATF) and the Boston Police Department (BPD) began an investigation

into firearms and drug trafficking and other suspected criminal behavior at the Orchard Park Housing Development in the Dudley Square area of Roxbury. PSR ¶ 7.  In total, cooperating witnesses made 46 purchases of crack cocaine or firearms from several different targets.  Government's Sentencing Memorandum ("GSM") at 6.

Mr. Scott plead guilty to a single sale of crack cocaine to a CW on April 14, 2017.  The entire weight of drugs sold was 1.06 grams, for a grand total of $80.  He did not complete any other drug transactions, had no involvement in any firearms transactions, nor was he observed in possession of any firearms. On June 6, 2017, investigators attempted to arrange another drug buy from Mr. Scott with the same CW.  Government agents were not able to consummate any deal, and the interaction concluded with Mr. Scott telling the CW not to contact him anymore.

Two months after the April 14 transaction, Mr. Scott was arrested at his home in Brockton and charged with the instant offenses.  He has been detained at the Plymouth County Correctional Facility ("PCCF") while this case has been pending. Mr. Scott plead guilty to a superseding indictment on November 28, 2017.  There is no plea agreement in this case, the government has proposed a sentence of 21 months with six years of supervised release, with conditions.  Sentencing is scheduled for March 26, 2018.

## GUIDELINE SENTENCING RANGE

The PSR and the government have determined that the Base Offense Level is 14.  With Acceptance of Responsibility, the PSR has determined that the Total Offense Level is 12, with a Guideline range of 15-21 months.

## ARGUMENT

### I.   AN INCARCERATVIE SENTENCE OF A YEAR AND A DAY WOULD BEST SATISFY THE GOALS OF SECTION 3553(a)

The sentencing of a defendant (at least since *Booker*) is not a mechanical exercise based purely on objective criteria. Rather, these sentencing factors call for the use of subjective judgment, *i.e.*, the exercise of judicial discretion based on consideration of the human condition and the vagaries of human conduct.  In essence, these factors express the "just desserts" concept of justice.  As stated in the Senate Report that was part of the Sentencing Reform Act, "It is another way of saying that the sentence should reflect the gravity of the defendant's conduct."  Sen. Rep. 98-225 at 75 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3258.  The sentence should thus reflect both the public's interest in the harm done and the defendant's interest in avoiding an unreasonably harsh sentence under all the circumstances of the case.  *Id.*

Defendant notes, however, that the deterrence and punishment goals of sentencing are only part of the equation,

albeit that focused on by the prosecution.  Incarceration has consequences that must be taken into consideration.  These consequences, often only dimly foreseen at sentencing, have a tremendous impact, not only on the offender, but also on families, communities, and on the nation as a whole. There have been hundreds of changes to state and federal law that impose additional penalties on felons; penalties that also impact families and the communities from which they come.

Mr. Scott asserts that a sentence of twelve months and a day and six years of supervised release with conditions, and participation in the RESTART program, will provide deterrence, just punishment for his crime, and also take into consideration the collateral consequences of imprisonment.  The defendant submits letters of support to justify this sentence.  See Defendant's Exhibit 1.

**A.   THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT.**

Under 18 U.S.C. § 3553(a)(1), the Court must consider the "history and characteristics of the defendant."

Lyndon Scott was arrested on June 15, 2017.  This was significant because it was just three days prior to his first Father's Day.  For many, the concept of Father's Day is a time to reflect upon our fathers before us, the fathers we have become, and the future fathers upon whom we attempt to imbue with family values and responsibility.

4

Mr. Scott was raised without a father.  At no point in his life was Father's Day a celebratory event.  That is, until London Scott, Mr. Scott's son, was born on February 10, 2017. The idea of being a father gives Mr. Scott perspective, resolve, and purpose, in a way that nothing has before.

Lyndon Scott was born in Boston, and raised in Roxbury by his mother, Wanda Scott-McField, who is a remarkably inspirational person, and a strong-willed African-American working single mother of two boys.  She raised Lyndon and his half-brother Markeith.  There is no shortage of praise and respect that Lyndon has for his mother.  She has been an unwavering source of support and guidance throughout his life. She worked hard for relatively very little so that her boys grew up with everything they needed.

Wanda came to Boston in 1979, put herself through school in Roxbury Community College and graduated from UMass-Boston with a degree in Human Services and Gerontology.  She worked for almost two decades at in the records department at Dimmock Hospital before she was recently laid off.

Wanda also supported Mr. Scott with his basketball career. Lyndon demonstrated talent a young age, and became an accomplished player.  He played for various school teams, travel teams, and AAU teams (one of which won the league championship). Both Lyndon's basketball and educational careers were derailed

in July of 2007 when he was detained pre-trial for charges that
he was ultimately acquitted of the following year.  After his
release on that case, Wanda relocated to 1004 North Main Street,
apartment six, in Brockton.  This will be Mr. Scott's formal
address upon his release.  For the two years that followed, Mr.
Scott worked primarily as a package handler at the FedEx
warehouse in Brockton.  The defendant's history and
characteristics are also incorporated in the following
paragraphs.

**B.   PRIOR RECORD, FINANCIAL STRUGGLES, AND LEGITIMATE
ATTEMPTS TO FIND WORK.**

Mr. Scott has two prior firearms convictions, for which he
makes no excuse.  The first occurred in Rhode Island when he was
just twenty years old in 2010.  The second occurred the
following year in June of 2011 out of Suffolk Superior Court.
In that case, he was offered a plea bargain to a reduced charge,
and accepted.

Mr. Scott attempted to make the most of his time while
incarcerated.  He completed the OSHA ten-hour General Industry
course, the Bay State College Inside Out Program for Sustainable
Justice, the Peace from Within training organized by PCCF, and
obtained his GED in 2013.  He also obtained his ServSafe
certification  See Defendant's Exhibit 2.

By the time Mr. Scott was released in April of 2015, he was

ordered to complete his probation under the supervision of the Brockton Superior Court.  He has never been convicted of any offense involving violence, and is not a violent person.

Mr. Scott was able to get his probation terminated months ahead of schedule. His violations were mainly for failure or inability to pay probation fees.  See Defendant Exhibit 3.

He made legitimate attempts to become gainfully employed. Mr. Scott worked as a laborer for Rentals Unlimited in Stoughton.  Mr. Scott also worked as a telemarketer for 1-800-Busydog in Stoughton, and also worked as a forklift operator at Ikea in Stoughton.  See Defendant's Exhibit 4.  These were the jobs available to a young man in his mid-twenties with a record of felony convictions, with no car, no post-graduate degree, and limited resources.[1]  For a period of time, he worked two jobs with no benefits, sometimes walking to work, in order to pay for rent, cellphone, food, home amenities like internet and cable, and paying his obligatory probation fees. He did not spend his money on luxury items like shoes or jewelry.  There was nothing glamorous about his lifestyle.

---

[1] Counsel personally reviewed completed online employment applications submitted by Mr. Scott.  They were sent to, among others, Restaurant Depot, Lynch Cleaning Contractors in Brockton, warehouse associate (XPO Logistics) in Avon, restaurant staff at Atlantic Kitchen in Randolph, deliver/mover for Aaron's in Brockton, warehouse associate (the Alpha group) in Avon, kitchen team member at Buffalo Wild Wings in Brockton, kitchen prep at Five Guys in Brockton, dishwasher at Outback Steakhouse, inventory specialist at Best Buy (Westgate Mall), warehouse worker at Mark IV Transportation and Logistics in Randolph, Moe's Southwest Grille in Brockton, MA, Barista at Starbucks in Brockton, Toys R Us Seasonal Stock crew team member in Brockton, and housekeeping at the Country Inn and Suites in Brockton.

Given his motivation and intellect, Mr. Scott was overqualified and underpaid for the jobs he was offered.  He undoubtedly has interpersonal skills that can translate to a professional career, if such an opportunity were to become available to him.

### C. IMAN HACKETT AND THE ROXBURY CASE

Iman Hackett is the mother of their son, London Scott, who is now just older than a year.  She was born and raised in Boston and graduated from Mission High School in 2009.  She received her degree in criminal justice from Quincy College in 2014.  Ms. Hackett received her associate's degree while working for Central Boston Elder Services. Currently, Ms. Hackett works at Children's Hospital in Boston as a patient experience representative.

Mr. Scott first met Ms. Hackett in 2010.  They reconnected in 2016 and began dating.  In an ultrasound appointment July 2016, they learned they were having a child.

Although the news was welcome, neither Ms. Hackett nor Mr. Scott was particularly prepared for this.  Neither of them had substantial financial means, nor did they receive any form of public assistance.  They were left to their own devices to prepare for the life of their child.

First-time parents can relate to the financial reality that sets in after factoring in the cost of diapers, formula,

bottles, strollers, bassinets, daycare, toys, clothes, and all of the other things that are necessary to raise a happy and healthy baby.  They took on this situation together, and continue to do so to this day.

On top of this, Mr. Scott had other financial obligations, including the monthly $65 per month probation supervision fee. In total, Mr. Scott approximately paid $1,400 dollars to the court, none of it for purposes of restitution, and his probation was terminated early on January 25, 2017.  Defendant's Exhibit 3; PSR ¶ 45.  This also affected his ability to satisfy payments to the RMV to reinstate his driver's license.

Mr. Scott was is currently charged with possession with intent to distribute a class B substance in Roxbury Court.  On February 3, 2017, just one day prior to his baby shower, and just one week before London's birth.  He was headed to the Boston RMV to pay off the license suspension fees, as well as the rental car.  Ironically, (or perhaps unfortunately for him) he was stopped for having a suspended license.  In the ensuing search, police located crack cocaine on his person.

Mr. Scott denies the allegations against him; specifically having engaged in a hand-to-hand drug transaction with anyone. PSR ¶ 49.  Moreover, Mr. Scott disputes the weight of the drugs

located.[2]  All money was seized.

To the extent that the court might consider doing so, it should not consider the open Roxbury charges as a significant factor in fashioning an appropriate incarcerative sentence in this case.  First, Mr. Scott has pleaded not guilty, and retains the presumption of innocence.  The Federal Sentencing Guideline Range remains unaffected.  Second, Mr. Scott still has to face those charges upon his release from federal custody.  Third, there are legitimate defenses to the case.  The search of him does not appear to be supported by sufficient cause, and there lacks evidence regarding his intent to distribute.  Ultimately, it will be a matter handled by the state court in due course upon his release.

**D. THE NATURE AND CIRCUMSTANCES OF THE UNDERLYING OFFENSE.**

In addition to the history and characteristics of the defendant," this Court must also consider the "nature and circumstances of the offense."  18 U.S.C. § 3553(a)(1).  In this context, sentencing courts consider the extent of the role of the defendant in the conspiracy and the circumstances that led to the defendant's involvement in the case.  *See, e.g., United States v. Posy*, No. 12-cr-00104-1, 2013 U.S. Dist. LEXIS 62004 (E.D.N.Y. Apr. 17, 2013) (taking into consideration that the

---

[2] The GSM and PSR indicate that the weight involved was ten grams, although the laboratory documents obtained by the government, are far less, at approximately 6.5 grams.

defendant was but "a minor player in a larger narcotics distribution conspiracy" and that defendant had been "unemployed and living on a relative's couch" when he took on the role of a courier in the drug conspiracy); *United States v. Pichardo*, No. 11-cr-00507, 2011 U.S. Dist. LEXIS 149971 (E.D.N.Y. Dec. 30, 2011) (taking into consideration defendant's minor role in the drug smuggling operation).

Mr. Scott made a single transaction of crack cocaine that weighed 1.06 grams.  This occurred at the tail end of an almost two-year investigation.  The government created still photographs of target persons congregated together, many of whom were targets in this investigation. The government submitted these photographs at the detention hearing in this case.  Mr. Scott is not in <u>any</u> of those photographs.  This is not a crime of violence.  The government argues that the second attempt by agents to lure Mr. Scott into committing a second transaction justifies harsher punishment, but he is not charged with any crime from that incident, and it concluded with Mr. Scott asking the CW to not contact him again.

There is no evidence to suggest that the defendant was leader of an organization, that he dealt in particularly large quantities (or had the capability to do so), or that he worked in concert with anyone else.  He was not specifically targeted by law enforcement in advance of this investigation.  There is

no evidence that the defendant maintained a premises for drug distribution activities.  Unlike other targets in the investigation, Mr. Scott did not make multiple transactions.  Therefore, a year and a day is an appropriate incarcerative sentence.

### E. SINCE THE DATE OF THE INCIDENT IN THIS CASE

Two months later, he was arrested.  His son, London, spent the first three months of his life living at home with this father.  Then his father was suddenly taken away.  Mr. Scott takes full responsibility for this.  Iman and London visit Mr. Scott every Sunday at PCCF.  Mr. Scott has had to watch his son grow up through a pane of clear, bulletproof glass.  London knows his father's voice.  He has eight teeth and is thirty-four pounds.  Being able to interact with his son in a meaningful way is what Mr. Scott lives for, and he dreams of a day when he can assure him that his father will always be with him.  He sees what his prior actions have cost him.  It is a situation he never wants to place himself in again.

His current detention has strained his relationship with Ms. Hackett.  They are still together, but she is struggling to make ends meet.  It has been difficult on her as a new, young mother.  Like Mr. Scott, she is overqualified and underpaid in her current job, but daycare is expensive, and a job with security and benefits has value.  Ms. Hackett and London both

desperately need Mr. Scott's help.  Mr. Scott blames himself for becoming an anchor to his family, and cutting himself off from being someone that can provide.  He is capable of so much more, and he knows this.

### F. THE DEFENDANT'S PLAN POST-SENTENCING

Mr. Scott is focused on obtaining a CDL license.  PSR ¶ 65. This was a plan already in the works prior to his arrest on this case.  At the time of the detention hearing, Mr. Scott had been accepted into a six-week CDL training program with the Teamsters Local 25 to obtain his Class A commercial driver's license. While in custody, Mr. Scott has been studying those materials with the hope that he can enroll in the next available course to obtain his CDL.  This begins on July 17, 2018.  He was fortunate enough to obtain financial aid.  Instead of paying the full $2000 cost, he will only have to pay $200.  After he completes the program, Mr. Scott could become a member of the union and obtain work in the private sector.

This program has been Mr. Scott's central focus.  Even a sentence of eighteen months in this case could make him ineligible for the July 17 program, and is further justification that a sentence of twelve months to twelve months and a day is appropriate.

Mr. Scott knows what how it feels to put in a hard day's work.  Regardless of the CDL, he has resolve to work and be a

productive person.  He is anxious and ready for the opportunity
to demonstrate to this court, the government, and his own
family, that he will not be defined by mistakes that he has made
in the past.  It isn't him.  He is a bright, young, and positive
person with hopes and dreams.  He is someone who considers the
needs of others before his own.  Mr. Scott is a respectful young
man who is desperate to be a real father to his son, and be a
foundation on which others in his life can build upon.

**G.   THE SENTENCING RATIONALES SET FORTH IN 18 U.S.C. §
3553(A)(2) SUPPORT A SENTENCE OF A YEAR AND A DAY.**

The sentencing rationales set forth in 18 U.S.C. §
3553(a)(2) also do not compel a sentence longer than a year and
a day.  Section 3553(a) directs the Court to consider the need
for the sentence imposed

(A)     to reflect the seriousness of the offense, to
        promote respect for the law, and to provide just
        punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the
        defendant; and
(D)     to provide the defendant with needed educational or
        vocational training, medical care, or other
        correctional treatment in the most effective
        manner.

18 U.S.C. § 3553(a)(2).

Mr. Scott realizes that his past cannot define his future.
Sentencing him to prison for a year and a day just punishment
for his offense.  Additional incarcerative time in this case is
neither appropriate nor necessary.  In the nine months he has

already served, he has already focused on his future like never
before.

In terms of deterrence, the hallmark punishment imposed by
this court will be the six years of supervised release.
Regardless of which sentencing recommendation the court adopts,
Mr. Scott will be well into his mid 30's by the time the
supervised release portion of his sentence concludes.  Right
now, he has a positive mentality, and has spent the majority of
his incarcerative time planning for his family's future.  At
this time, he is eager and motivated to move forward.  Placing
him on supervised release sooner, rather than later, will
capitalize upon his mindset, and conditions imposed by the court
will protect the public.

Finally, a sentence beyond a year and a day is also not
necessary to "provide the defendant with needed educational or
vocational training, medical care, or other correctional
treatment in the most effect manner."  18 U.S.C. §
3553(a)(2)(D).  Instead, those services can and will only be
available to him upon his release.  Mr. Scott has plans for his
future.  He is aware of programs available to him, such a
RESTART, and is anxious and ready to begin them.

Lyndon Scott is not a violent offender  who poses any
threat to society.  He should be sentenced to a year to a year
and a day, with six years of supervised release.

## H. REFUTATION OF THE GOVERNMENT'S CLAIMS

The defendant is not a member of the Orchard Park Trailblazers, nor is he a member of any gang, and objects to that assertion.  Detective Gregory Brown testified at the detention hearing and said that despite his extensive experience in investigating the Orchard Park area, he had no prior familiarity with Mr. Scott.  The defendant also objects to the government's suggestion that the number of FIOs in the Roxbury area justifies a more punitive sentence.  These FIOs occurred in the area in which Mr. Scott was raised.  In that community, he is a popular person, and not for nefarious reasons.  People are drawn to him.  Wherever he goes he makes connections with people around him, and many of whom have little to no connection with criminal activity.  The support letters corroborate this.  See Defendant's Exhibit 1.

The fact that police saw him in Roxbury on dozens of occasions over a span of years, says absolutely nothing about Mr. Scott's criminality, and is irrelevant to this case.

The government claims that police officers, "are left with little to no enforcement options if the encounter does not rise to the level of arrest; the encounter is documented on a[n] [FIO], and these individuals are free to stay in the community." GSM at pg 6.

This is precisely what should happen when no criminal

activity is afoot.  The presupposition that a group of young black males who are FIO'd are committing a crime is a notion antithetical to legitimate law enforcement.  The ACLU has analyzed FIO data made available by the BPD, and has concluded that, even controlling for racial factors within the community, black persons in Boston are more likely to be FIO'd than persons of other races.[3]

Mr. Scott is not the scourge of Roxbury.  People who know Mr. Scott understand this.  He has made mistakes, but the reality is that the long-term consequences of those mistakes are harder to overcome when someone is young, black, and underprivileged.

## I.   OPPOSITION TO CURFEW, AND GEORAPHICAL AND ASSOCIATIONAL RESTRICTIONS.

Mr. Scott is mature enough to understand that he must leave Orchard Park behind.  It is a part of his past, not his future. The defendant formally objects to the imposition of the geographical and associational restrictions recommended by the government.  They are far too reaching.  Nevertheless, he would agree to some forms of restriction, if so required.

Under the government's plan, Mr. Scott would essentially be prohibited from entering Roxbury entirely for the next six years.  It is far greater than necessary to achieve sentencing

---

[3] See, Black, Brown and Targeted, ACLU, October 2014, available at: https://aclum.org/wp-content/uploads/2015/06/reports-black-brown-and-targeted.pdf

goals.  Instead, if the court deems that a geographical restriction is necessary, the defendant counter-proposes that a smaller geographic range is appropriate.  See Defendant's Exhibit 5.  The defendant's plan, if ordered by the court, would restrict from entering the immediate area in which these offenses occurred.  This would satisfy the government's stated goals.  The Roxbury Division of the BMC is also within the government's proposed restricted area, but currently, the parties are working toward a compromise on that issue.

Additionally Iman's aunt, Brenda Carter, lives at 1104 Harrison Avenue.  This is within even the defendant's suggested geographical range.  Her home is a frequent location for family gatherings, but it is possible that Mr. Scott can acquire permission in advance of those gatherings so that he can attend.

In terms of associational restrictions, Mr. Scott agrees to disassociate with all but three of twenty-five names listed.[4] They are Dashawn Matthews, Tory Thorton, and Johnny Bell Stevens.  Mr. Matthews and Mr. Thorton are both life-long and best friends of Mr. Scott.  They are also his son's godfathers. They were not targets in this investigation.  They grew up together, and played basketball together. Mr. Thorton has no convictions that defense counsel is aware of, and has had worked a steady job for the last thirteen years.  Similarly, Mr.

---

[4] The defendant has no familiarity whatsoever with some of the names listed.

18

Matthews has never been incarcerated, and has in the past assisted Mr. Scott in obtaining employment.  They are both positive influences on his life, and to the extent they have been able, have helped Iman raise London while Mr. Scott cannot.

Mr. Stevens is a life-long childhood friend of Mr. Scott's. He is from Dorchester, not Roxbury, and has also assisted Mr. Scott in obtaining employment.  Mr. Stevens is also a father, and has been supportive of Mr. Scott's positive efforts.

Mr. Scott understands that the other persons targeted in this investigation will not support him in true times of need. They are not a part of his vision for the future.

With respect to the curfew period, upon release the defendant intends to share time between his home in Brockton and Iman's house in Dorchester.  Her daily work hours are not fixed, and some days she is required to work as late as 8:00 p.m.  If the court deems that a curfew is necessary (which the defendant objects to), the defendant requests a curfew period of midnight to 7 a.m., so that he would have sufficient time to assist Iman and his son, and have sufficient time to travel back to Brockton, if so required by the court.

## CONCLUSION

For each and all of the foregoing reasons, a sentence of a year to a year and a day, no fine due to his present lack of resources, and six years of supervised release (with the

conditions proposed by the defendant), is "sufficient, but not greater than necessary," to achieve the sentencing goals of 18 U.S.C. § 3553(a).  Taken together, the history and characteristics of the defendant, the nature and circumstances of the offense, the sentencing factors described in Section 3553, all support the disposition requested herein.

LYNDON SCOTT
By his attorney,

/s/ Austin C. Tzeng
AUSTIN C. TZENG
Law Office of Austin C. Tzeng
Suite 501
21 Mayor Thomas J. McGrath Hwy
Quincy, MA 02169
781-929-4882

COUNSEL TO LYNDON SCOTT

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 22, 2018.

/s/ Austin C. Tzeng
Austin C. Tzeng, Esq.